# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

TAMMY MCQUILLAN,
      Plaintiff,

v.

ANDREW SAUL, Commissioner of Social
Security,
      Defendant.

No. 3:19-cv-00191 (SRU)

## RULING ON CROSS-MOTIONS FOR JUDGMENT ON THE PLEADINGS

In this Social Security appeal, Tammy McQuillan moves to reverse the decision by the

Social Security Administration ("SSA") denying her claim for disability insurance benefits.

Mot. to Reverse, Doc. No. 15. The Commissioner of Social Security[1] moves to affirm the

decision. Mot. to Affirm, Doc. No. 16. For the reasons set forth below, McQuillan's Motion to

Reverse (doc. no. 15) is DENIED and the Commissioner's Motion to Affirm (doc. no. 16) is

GRANTED.

## I.    Standard of Review

The SSA follows a five-step process to evaluate disability claims. *Selian v. Astrue*, 708

F.3d 409, 417 (2d Cir. 2013) (per curiam). First, the Commissioner determines whether the

claimant currently engages in "substantial gainful activity." *Greek v. Colvin*, 802 F.3d 370, 373

n.2 (2d Cir. 2015) (per curiam) (citing 20 C.F.R. § 404.1520(b)). Second, if the claimant is not

working, the Commissioner determines whether the claimant has a "'severe' impairment," i.e.,

an impairment that limits his or her ability to do work-related activities (physical or mental). *Id.*

---

[1] The case was originally captioned "Tammy McQuillan v. Nancy A. Berryhill, Acting Commissioner of Social Security." Since the filing of the case, Andrew Saul has been appointed the Commissioner of Social Security.

(citing 20 C.F.R. §§ 404.1520(c), 404.1521). Third, if the claimant does not have a severe impairment, the Commissioner determines whether the impairment is considered "per se disabling" under SSA regulations. *Id*. (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526). If the impairment is not per se disabling, then, before proceeding to step four, the Commissioner determines the claimant's "residual functional capacity" based on "all the relevant medical and other evidence of record." *Id.* (citing 20 C.F.R. §§ 404.1520(a)(4), (e), 404.1545(a)). "Residual functional capacity" is defined as "what the claimant can still do despite the limitations imposed by his [or her] impairment." *Id.* Fourth, the Commissioner decides whether the claimant's residual functional capacity allows him or her to return to "past relevant work." *Id.* (citing 20 C.F.R. §§ 404.1520(e), (f), 404.1560(b)). Fifth, if the claimant cannot perform past relevant work, the Commissioner determines, "based on the claimant's residual functional capacity," whether the claimant can do "other work existing in significant numbers in the national economy." *Id.* (citing 20 C.F.R. §§ 404.1520(g), 404.1560(b)). The process is "sequential," meaning that a petitioner will be judged disabled only if he or she satisfies all five criteria. *See id.*

The claimant bears the ultimate burden to prove that he or she was disabled "throughout the period for which benefits are sought," as well as the burden of proof in the first four steps of the inquiry. *Id.* at 374 (citing 20 C.F.R. § 404.1512(a)); *Selian*, 708 F.3d at 418. If the claimant passes the first four steps, however, there is a "limited burden shift" to the Commissioner at step five. *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam). At step five, the Commissioner need only show that "there is work in the national economy that the claimant can do; he [or she] need not provide additional evidence of the claimant's residual functional capacity." *Id.*

In reviewing a decision by the Commissioner, I conduct a "plenary review" of the administrative record but do not decide *de novo* whether a claimant is disabled. *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam); *see Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam) ("[T]he reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."). I may reverse the Commissioner's decision "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole." *Greek*, 802 F.3d at 374-75. The "substantial evidence" standard is "very deferential," but it requires "more than a mere scintilla." *Brault*, 683 F.3d at 447–48. Rather, substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Greek*, 802 F.3d at 375. Unless the Commissioner relied on an incorrect interpretation of the law, "[i]f there is substantial evidence to support the determination, it must be upheld." *Selian*, 708 F.3d at 417.

## II.    Facts

### A.    Medical Background

#### 1.    *Mental Health*

On August 21, 2015, McQuillan was admitted to Kent Hospital in Warwick, Rhode Island, where she was diagnosed with schizoaffective disorder. R. at 304. The examining provider, Kelly A. Brunette, found that she was "anxious, restless, [and] inappropriate at times." R. at 314. Three days after admission, she was discharged with instructions to follow-up with her primary care physician, Dr. Sara Delaporta. *Id.* Following discharge from Kent Hospital ("Kent") McQuillan was admitted to Butler Hospital ("Butler") on August 24, 2015, where she was treated by Dr. Alison Swigart. R. at 326. On the day of admission, Dr. Swigart noted that

McQuillan had been brought to Kent by the police due to "bizarre behavior and mood lability." *Id.* The treatment notes also state that McQuillan was very agitated and required restraints at Kent. R. at 328. During her intake examination, Dr. Swigart observed that while McQuillan exhibited anxious, agitated and at times inappropriate behavior, there were no evident delusions, and she denied any perceptual abnormalities or hallucinations. R. at 327. Ironically, McQuillan also reported being in "direct communication with God at all time(s)." R. at 326. Regardless, McQuillan exhibited adequate insight and judgment; moreover, she was able to attend to the interview, and recall personal history and recent events. R. at 327. At discharge, Dr. Swigart found that McQuillan's mood was stable and there were no safety concerns. R. at 329. Although McQuillan was diagnosed with Bipolar I disorder, severe without psychotic features, she was deemed "stable for transition to outpatient care." *Id.*

After discharge, McQuillan attended two appointments, one on September 2, 2015 and another twelve days later at West Bay Psychiatric Associates ("West Bay"). R. at 334−35. During the course of her treatment, McQuillan lost her job but providers at West Bay noted that her continued stressors were "reasonably stable." *Id.*

From September 18, 2015 to March 23, 2016, McQuillan visited Thundermist Health Center ("Thundermist") where she treated mainly with Dr. Sara Delaporta and Nurse Mary Rose, a psychiatric mental health nurse practitioner. On September 18, 2015, Dr. Delaporta observed that McQuillan was anxious and irritable; however, she was in no acute distress, her thought process was normal and her judgment was intact. R. at 344. Despite experiencing sleep disruption and anxiety, McQuillan reported that she was feeling better. *Id.* Dr. Delaporta noted that McQuillan denied any suicidal ideations, homicidal ideations or hallucinations. *Id.* On November 3, 2015, McQuillan followed up with Dr. Delaporta for a routine physical

examination and a flu shot.  R. at 421.  McQuillan's mood and affect were appropriate and she

reported that she was "happy with [her] mental health care."  *Id.*  McQuillan was referred to a

physical therapist to treat "long standing left knee and back pain."  R. at 422.

From November 10, 2015 until March 23, 2016, McQuillan saw Nurse Rose for

medication management.  Treatment notes from McQuillan's first visit to Nurse Rose in

November 2015 indicate that McQuillan suffered from audiovisual hallucinations, insomnia, and

her mood was labile and irritable.  R. at 419.  Nine days later, McQuillan reported that her

audiovisual hallucinations were "not as severe," her mood was "good," and she was sleeping

better.  R. at 417.  Nurse Rose observed that McQuillan's thought process was appropriate, her

behavior was cooperative, and she was attentive and focused during the appointment.  *Id.*  At a

follow-up appointment on November 24, 2015, McQuillan reported continued audiovisual

hallucinations, albeit with fewer episodes.  R. at 415.  The following month, despite intermittent

episodes of audiovisual hallucinations and persistent insomnia, McQuillan reported that her

"mood [was] improving and [she felt] more stable overall."  R. at 413.  Two weeks later,

McQuillan reported that she continued to experience audiovisual hallucinations with paranoid

ideations that were "very negative in nature."  R. at 411.  In response, Nurse Rose increased the

dose of McQuillan's medication.  R. at 412.  On January 14, 2016, McQuillan returned for

medication management.  R. at 409.  Nurse Rose observed that McQuillan's mood had improved

since her last visit.  *Id.*  In addition, the treatment notes indicate that McQuillan was cooperative,

focused, alert, and oriented.  *Id.*  McQuillan reported that she had not experienced an episode of

audiovisual hallucinations in the last five days and her mood was "more stable."  R. at 410.

When McQuillan returned fifteen days later, she reported experiencing less episodes of

audiovisual hallucinations.  R. at 407.  She also reported that her symptoms were abating with

medication.  *Id.*  Nurse Rose changed McQuillan's medication regimen and scheduled a follow-up appointment in two weeks.  R. at 407–08.

On February 11, 2016, McQuillan saw Nurse Rose for medication management.  R. at 405.  Nurse Rose indicated that McQuillan's mood had improved since her last appointment, and there were no "current issues with depression or anxiety."  *Id.*  Although McQuillan reported difficulty sleeping, Nurse Rose documented that the medications were helping.  *Id.*  As a result, the medication regime and treatment plan remained unchanged.  Two weeks later, McQuillan followed up with Nurse Rose for medication management.  R. at 403.  The treatment notes indicate that McQuillan did not complain of either depression or mania and her symptoms were well-controlled with medication.  R. at 402–03.  During the visit, however, McQuillan expressed concern regarding the exhaustion of her temporary disability insurance benefits.  R. at 404.  Specifically, McQuillan was "afraid and nervous that she [would] be homeless by May."  *Id.*  In response to McQuillan's concerns, Nurse Rose arranged for McQuillan to speak to someone regarding "possible housing options."  *Id.*

At a follow-up appointment on March 8, 2016, McQuillan reported that she was sleeping better and no longer experiencing audiovisual hallucinations.  R. at 439.  The treatment notes indicate that McQuillan was cooperative, alert and oriented.  *Id.*  Additionally, McQuillan was focused, her thought process was appropriate, and she demonstrated good insight and judgment.  *Id.*  During the visit, McQuillan reported that she was following a three-week diet plan, which had resulted in a weight loss of fifteen pounds.  *Id.*  A general examination revealed that McQuillan's gait was stable.  *Id.*  The symptoms associated with anxiety and depression, however, were "still there."  *Id.*  As a result, Nurse Rose increased McQuillan's dose of antidepressant medication and scheduled a follow-up appointment in two weeks.  *Id.*  The next –

and apparently last – appointment McQuillan had with Nurse Rose took place on March 23, 2016. R. at 437. McQuillan indicated that she was switching to the care of a therapist and a psychiatrist, as suggested by her disability lawyer. *Id.* In her treatment notes, Nurse Rose documented that McQuillan was "not having any psychotic symptoms at this time or since her last appointment." *Id.* Additionally, "her mood [was] stable." *Id.* Overall, the treatment notes from that three-month period show that McQuillan was compliant with her medications and her symptoms improved with treatment.[2] R. at 403−19.

From December 1, 2015 to January 10, 2017, McQuillan saw Dr. Terrie A. Mailhot, a psychiatrist at Quality Behavioral Health. R. at 452−61; 537−52. In December 2015, McQuillan reported increased worries because she had exhausted her temporary disability insurance benefits. R. at 458. She also reported experiencing hallucinations. *Id.* After a prolonged absence, McQuillan returned to Dr. Mailhot on April 8, 2016. R. at 454. McQuillan explained that she returned because she "went to a lawyer who said [she] needed a psychiatrist." R. at 454. Again, McQuillan reported hearing voices. *Id.* In May 2016, McQuillan continued to report hallucinations, as well as trouble sleeping. R. at 453. On June 16, 2016, Dr. Mailhot's treatment notes indicate that McQuilllan reported feeling very tired, and experiencing nightmares. *Id.* His overall impression, however, was that McQuillan was "much more put together" during the appointment. *Id.* On October 18, 2016, McQuillan returned to Dr. Mailholt, and continued to report feeling tired and miserable. R. at 548. Dr. Mailhot observed that McQuillan appeared irritable. *Id.* In November 2016, Dr. Mailhot documents that McQuillan was "no longer paranoid," but feared something "bad [might] happen." R. at 547. On January 10, 2017,

---

[2] The medical record also reflects that McQuillan walked with a normal gait at each appointment.

McQuillan asked Dr. Mailholt to reduce the dosage of clorazepam. R. at 544. Dr. Mailhot observed that McQuillan looked healthier. *Id.*

On March 18, 2016, McQuillan began seeing Marybeth Greifendorf ("Greifendorf") a clinical therapist with Quality Behavioral Health, Inc. R. at 537. On August 24, 2016, and again on February 3, 2017, Greifendorf submitted a Mental Medical Source Statement (MSS) for McQuillan. R. at 542. Both reports are essentially the same, with the exception that the August date was crossed out and replaced with the February date. *Id.* According to the MSS, McQuillan reported a "significant decrease in auditory hallucinations since [April] 2016" and "no mania since [January] 2016. R. at 537. Despite reports of increased irritability and poor sleep, Greifendorf observed that McQuillan appeared "to be improving with regard to mood stabilization, psychosis, and self-esteem." *Id.* In the first grid for "mental abilities and aptitudes needed to do unskilled work," Greifendorf checked "no useful ability to function" next to the following categories: remember work-like procedure; maintain attention for two-hour segment; maintain regular attendance; deal with normal work stress; and complete a normal workday and workweek without interruptions from psychologically based symptoms, among other categories. R. at 539. In the second and third grids, Greifendorf explained that "increased stress produces mood instability and panic episodes." R. at 540. When asked to estimate how many days McQuillan might be absent from work as a result of her condition, Greifendorf selected the box "[m]ore than four days per month." R. at 541.

On February 22, 2017, McQuillan returned to Greifendorf. R. at 624. During the visit, McQuillan indicated that she experienced some audio hallucinations, but stated that she was able to ignore them. *Id.* Three months later, in May 2017, McQuillan returned and reported

experiencing nightmares about the devil and hearing voices telling her that "she's going to hell." R. at 625.

## 2. *Physical Impairments*

On November 3, 2015, McQuillan underwent a physical exam. R. at 421. She complained of long-standing left knee pain; as a result, Dr. Delaporta referred McQuillan for physical therapy at Elite Physical Therapy ("Elite"). R. at 427. McQuillan treated at Elite from November 9, 2015 through January 24, 2016. *Id.* In November 2015, McQuillan reported that she had trouble lifting, sitting and standing for prolonged periods, and could not walk for more than thirty minutes at a time. R. at 428. By January 2016, however, McQuillan's physical therapist documented that she had "responded well to conservative care including decreasing pain intensity and frequency, increased tolerance to sleeping positioning, sitting and sit to stand transfers, as well as ambulation." R. at 511. At that time, and before the full resolution of her symptoms, McQuillan withdrew from physical therapy. *Id.*

On February 24, 2016, McQuillan was examined by Dr. Michael Nissensohn at the request of the Disability Determination Services. R. at 398. Dr. Nissensohn observed that McQuillan showed "some difficulty walking," and favored "a limp in her right knee more than her left." R. at 399. He also found "1+ edema from midshin to ankle bilateral." R. at 400. In his report, Dr. Nissensohn noted that McQuillan experienced tenderness to palpitation of both knees, decreased range of motion, and swelling of the joints. *Id.* McQuillan also had "some bony abnormalities persistent with chronic osteoarthritis." *Id.* Despite an abnormal gait, Dr. Nissensohn observed that McQuillan had a normal station. R. at 399. A straight leg test was negative and her "upper extremities revealed good preservation of fine motor function of fingers and normal range of motion in the fingers, wrist, elbow and shoulder." R. at 400. Finally, with

respect to McQuillan's allegations of hypertension and reflux, Dr. Nissensohn found that both conditions were well controlled. *Id.* Dr. Nissensohn diagnosed bilateral knee osteoarthritis secondary to morbid obesity. *Id.* He determined that there was evidence that would "make it difficult for her to perform any significant job function at this time." R. at 401.

On April 7, 2016, McQuillan saw Dr. Sara Delaporta at Thundermist and complained of back and left leg pain but no numbness or weakness. R. at 435. McQuillan also complained of sleep apnea and night terrors. *Id.* Her physical examination confirmed lower back pain and a decreased range of motion; however, her motor strength was normal and symmetrical in her upper and lower extremities, and she displayed a normal gait. *Id.* Dr. Delaporta found there was "no clear ind[ication] for imaging besides prolonged pain." R. at 436. As a result, Dr. Delaporta referred McQuillan for an osteopathic manipulative medicine ("OMM") appointment. *Id.*

On April 25, 2016, McQuillan returned to Thundermist for an OMM appointment with Dr. Jonathan Andersen. R. at 432. McQuillan claimed that her back pain worsened when she moved or cleaned; however, the pain in her back did not radiate to her legs, and she did not experience any weakness or numbness. *Id.* She also reported that her left leg felt weak when she climbed stairs. *Id.* Dr. Andersen documented a decreased range of motion in her lumbar spine and tenderness to palpation in her left sacroiliac joint. *Id.* A neurological examination indicated normal motor strength in her lower extremities, normal sensation to light touch, and a normal gait. *Id.* In addition to the physical examination, Dr. Andersen conducted a depression screening, and the result was a finding of mild depression. *Id.* Dr. Andersen noted that McQuillan was pleasant during the examination, maintained good eye contact, and displayed appropriate mood and affect. *Id.* Following her osteopathic manipulative treatment ("OMT")

Dr. Andersen noted subjective and objective improvement. R. at 433. McQuillan was advised to "continue stretching and exercising" and to increase her fluid intake. *Id.*

Approximately two days later, on April 27, 2016, McQuillan was seen by Dr. Keith Brecher for complaints of "severe pain that runs in a straight line from the hip to the knee," left lower back pain and a two-year old ankle injury. R. at 466. During the visit, Dr. Brecher observed that McQuillan was awake, alert and oriented to date, place and person; she was attentive; her speech was clear; and her language was fluent. R. at 466. She showed normal sensory responses in both her upper extremities and lower extremities, and her gait was unremarkable. *Id.* Dr. Brecher ordered magnetic resonance imaging ("MRI") of the lumbar spine to rule out radiculopathy. R. at 467. The MRI, which was performed in June 2016, revealed leftward curve of the lower spine and mild lumbar spondylosis. R. at 463. When McQuillan returned to Dr. Brecher for a follow-up visit in July 2016, Dr. Brecher noted that the "lumbar MRI failed to show definite compression of upper lumbar nerve roots to explain the pain." R. at 464. Dr. Brecher diagnosed McQuillan with meralgia paresthetica,[3] finding that her "left lateral femoral cutaneous nerve in the inguinal regional of the pelvis" was compressed. *Id.* McQuillan was encouraged to continue losing weight and to perform home exercises. *Id.*

In August 2016, McQuillan visited Dr. Thomas Bliss for evaluation of foot and ankle pain. R. at 492. A physical examination revealed "reasonable range of motion of her back, hips and knees." *Id.* Although McQuillan suffered from bilateral varus deformity of her heels and [pes] cavus deformity of the feet, "the x-rays of her right foot and ankle show[ed] a fairly

---

[3] The cause of meralgia paresthetica is compression of the nerve that supplies sensation to the skin surface of the thigh. Tight clothing, obesity or weight gain, and pregnancy are common causes of meralgia paresthetica. *Meralgia Paresthetica*, MAYOCLINIC.ORG, http://www.mayoclinic.org/diseases-conditions/meralgia-paresthetica/basics/definition/con-20030852 (last visited October 25, 2019).

normal-appearing ankle joint." *Id.* Dr. Bliss referred her to Dr. Blankenhorn for "questionable surgery." *Id.*

In September 2016, McQuillan was evaluated for "sleep disordered breathing" at Kent Sleep Medicine by Dr. Franklin D. McCool. R. at 495. An overnight sleep study revealed severe sleep apnea with hypoxemia. *Id.* McQuillan's apnea, however, was well-controlled with a full, face mask CPAP. *Id.* During the evaluation, Dr. McCool observed that McQuillan was alert and oriented and in no acute distress. R. at 497. Furthermore, her mood and affect were appropriate and she was not anxious. *Id.* She exhibited normal muscular strength and a normal gait. *Id.* Finally, McQuillan reported not feeling any joint pain or muscle spasms. *Id.* Dr. McCool opined that weight loss could reduce or eliminate the need for a CPAP. R. at 498.

In the months of September and October, McQuillan visited Dr. Brad B. Blankenhorn, an Orthopedist specializing in foot and ankle surgery. R. at 630. She presented with complaints of right ankle instability, and right lateral and dorsal foot pain. *Id.* On September 14, 2016, Dr. Blankenhorn noted that she was alert and in no apparent distress. R. at 632. McQuillan's mood was appropriate and congruent, and her judgment and insight were appropriate for the situation. *Id.* Dr. Blankenhorn noted mild gait problems but normal muscle strength in her lower extremities, as well as full range of motion in the left ankle. *Id.* The right ankle had limited subtalar range of motion but there were no signs of ankle instability. R. at 633. Imaging studies of McQuillan's right ankle indicated "mild-to-moderate subtalar arthritis with possibility of articular incongruity," as well as a posterior calcaneal spur. *Id.* To better evaluate the area, Dr. Blankenhorn ordered an MRI.

On October 26, 2016, an examination revealed mild swelling and tenderness to palpation in McQuillan's lateral hindfoot. *Id.* An x-ray, taken in September, revealed mild-to-moderate

subtalar arthritis and a posterior calcaneal spur.  R. at 633.  An MRI taken at the beginning of October, on the other hand, was relatively normal.[4]  R. at 630.  To relieve her pain, Dr. Blankenhorn recommended surgical intervention to "realign her foot into a better position."  R. at 631.  There is no evidence in the record that the surgery ever took place.

On November 15, 2016, McQuillan returned to Thundermist where she was seen by Dr. Kara Kopaczewski.  R. at 470.  McQuillan complained of a swollen neck, loss of appetite and feeling tired.  *Id.*  Dr. Kopaczewski ordered an ultrasound of her neck, which revealed no abnormalities or lymphadenopathy.  R. at 481.

On January 25, 2017, McQuillan sought treatment for psoriasis and a mole on her left breast with dermatologist Anita Pedvis-Leftick, M.D.  R. at 605.  Dr. Pedvis-Leftick observed a slightly atypical nevus on her left breast.  *Id.*  She also observed psoriasis involving McQuillan's "arms, left leg and face," covering approximately two percent of her body surface area.  *Id.*  Dr. Pedvis-Leftick opined that McQuillan's hypertension medication was aggravating the condition and suggested that McQuillan's psoriasis might improve with a change in medication.  *Id.*  During the visit, McQuillan reported that she was "not bothered by joint pain or morning stiffness."  *Id.*

On February 17, 2017, McQuillan saw Dr. Delaporta for a routine physical exam.  R. at 597.  Dr. Delaporta found McQuillan's mood was stable, despite the loss of her ex-boyfriend.  *Id.*  In fact, McQuillan reported that her mood had been stable for two years.  *Id.*  Overall, Dr. Delaporta's documentation reveals a routine exam with no complications.  An MRI of her hip in

---

[4] "She is not having significant arthritis about the subtalar joint or ankle joint, and her TMT joints appear to be normal . . . I cannot give her a good explanation for . . . where her midfoot pain is coming from given the fact that her MRI is relatively normal."  R. at 630.

March 2017 showed a subchondral cystic change, as well as a degenerative change of the left hip. R. at 553. There appears to have been no follow-up.

On May 25, 2017, McQuillan visited the Emergency Room at Williamson Medical Center in Franklin, Tennessee, seeking treatment for leg edema. R. at 571. McQuillan reported experiencing "diffuse swelling in [her] feet, hands, and around [her] neck" approximately eight hours after taking a steroid prescribed to treat an upper respiratory infection. R. at 581. Despite her symptoms, she drove approximately fifteen hours, from Connecticut to Tennessee, before visiting the emergency room. *Id.* Dr. Jon Andrew Russell, the emergency room physician, noted "no obvious swelling about her neck" and no asymmetry. R. at 582. A physical examination of her back revealed that McQuillan enjoyed full, painless range of motion and there was no evidence of costovertebral angle tenderness. *Id.* The treating physician also noted trace edema of the lower extremities. *Id.* McQuillan was given a medication to counteract the effect of the steroid and discharged. R. at 584.

B. Administrative Proceedings

On September 21, 2015, McQuillan filed for SSD and SSI benefits under Title II of the Social Security Act. 42 U.S.C. §§ 401, *et seq.*, 1381, *et seq.* McQuillan alleged that she had been unable to work since August 19, 2015 because she suffered from the following conditions: insomnia, bipolar disorder, osteoarthritis of both knees, schizoaffective disorder, obesity, left leg lower joint pain, breast cyst, psoriasis, impaired fasting glucose, anemia, iron deficiency, lipoma, hypertension, gastroesophageal reflux disease ("GERD") and she was a hepatitis B carrier. Disability Determination Explanation, R. at 63. At the time of the alleged onset of disability, McQuillan was approximately 45 years old. *Id.* The Secretary rejected her application on March 9, 2016, and again on reconsideration on August 18, 2016, finding that McQuillan's "condition

14

[was] not severe enough to keep [her] from working." Notice of Disapproved Claim, R. at 89.

McQuillan then requested a hearing before an Administrative Law Judge ("ALJ") which was

held on July 24, 2017. Tr. of ALJ Hr'g, R. at 36.

C. Hearing

On July 24, 2017, a hearing was held before ALJ Jason Mastrangelo. McQuillan testified

that she was a forty-seven-year-old mother of two children over the age of eighteen. Tr. of ALJ

Hr'g, R. at 42. McQuillan testified that she had not worked since August of 2015. *Id.* at 44.

McQuillan testified that she had no income, she received food stamps, and she lived with her

aunt. *Id.* at 43. McQuillan also testified that she suffered from sleep apnea, which affected her

ability to drive because she "g[ot] tired." *Id.* at 43. McQuillan testified that she received

treatment, both medication and counseling, because she sometimes heard the voices of God and

the devil. *Id.* at 48. She also testified that she has difficulty concentrating, experiences loss of

memory, experiences audio hallucinations, and sometimes has trouble getting out of bed. *Id.* at

47 and 54–55. Since August 2015, McQuillan testified that she has traveled to Texas and

Tennessee to visit family and attend a wedding. *Id.* at 50. During the trips, McQuillan testified

that she had difficulty walking because she experienced pain in her right foot from an untreated

heel fracture, as well as the fusion of bones in her foot. *Id.* at 51.

During the hearing, the ALJ questioned McQuillan about a period, from 2002 to 2005,

when McQuillan received disability benefits through social security. *Id.* at 46–47. During that

time period, McQuillan testified that she heard voices and experienced similar "mental" issues.

*Id.* at 55. Despite treatment with medication, McQuillan testified that she continued hearing

voices. *Id.* at 55-56. The disability benefits ended when McQuillan returned to work in 2005.

*Id*. McQuillan testified that she worked for ten years as a sales engineer for an internet-based

company that sold "heavy warehouse equipment." *Id.* at 44-47. McQuillan explained that she was tasked with preparing the "layouts of the equipment," which required "consider[ing] the weight and different factors to sell the right equipment." *Id.* at 45. McQuillan testified that she was fired in August 2015 because of attendance issues following multiple hospitalizations.[5] *Id.* at 46.

The ALJ also heard testimony from Vocational Expert Michael Laray ("Laray"). *Id.* at 57. The ALJ asked Laray to characterize McQuillan's past work. Laray characterized McQuillan's sales position as sedentary. *Id.* at 58. The ALJ then asked Laray to consider a hypothetical individual with the following characteristics: an individual of McQuillan's age, education, and work experience who is (i) limited to lifting and carrying 20 pounds occasionally, 10 frequently; (ii) can sit, stand and walk six hours in an eight-hour workday; (iii) could occasionally climb stairs and ramps, but may never climb ladders, ropes, and scaffolds; (iv) may occasionally balance, crouch, kneel, or crawl; (v) could frequently stoop; (vi) would be limited to maintaining occasional interaction with coworkers and supervisors; and (vii) would be unable to interact appropriately with the general public. *Id.* The ALJ asked whether the hypothetical individual could perform McQuillan's past work, to which Laray responded that the individual would be unable to perform the past work of sales; however, the individual could still perform light duty work, such as packaging or electronic work. *Id.*

For the second hypothetical, the ALJ asked Laray to assume the hypothetical individual (i) would be unable to maintain attention and concentration to carry out simple tasks consistently; (ii) would be unable to interact appropriately with supervisors; (iii) would be unable to tolerate work pressure (e.g., attendance, persistence, pace and productivity); and (iv) would be

---

[5] In her Function Report, McQuillan stated that she was fired because she "did not like the verbal[ly] abusive environment . . . ."

unable to tolerate simple changes in the routine work setting. *Id.* at 58-59. Laray testified that the limitations would "rule out all full-time competitive work." *Id.* at 59. Laray explained that missing work at least one time per week would rule out full-time competitive employment because that level of absenteeism is beyond the bounds of reasonable employer tolerance. *Id.*

### D. The ALJ's Decision

On August 24, 2017, the ALJ issued an opinion in which he found that McQuillan was not "under a disability, as defined in the Social Security Act, from August 19, 2015, through the date of this decision." ALJ Decision, R. at 21. At the first step, the ALJ found that McQuillan "ha[d] not engaged in substantial gainful activity since August 19, 2015, the alleged onset date." *Id.* at 19. At the second step, the ALJ determined that McQuillan's impairments of "schizoaffective disorder, bilateral knee arthritis, obesity, mild lumbar spondylosis, bipolar disorder, and meralgia paresthetica in the inguinal region from left lateral femoral cutaneous nerve compression" were severe impairments that "significantly limit[ed] [her] ability to perform basic work activities." *Id.*

At the third step, the ALJ determined that McQuillan "[did] not have an impairment or combination of impairments that [met] or medically equal[ed] the severity of one of the listed impairments." ALJ Decision, R. at 21. In making this finding, the ALJ considered whether McQuillan's physical impairments met or medically equaled listing sections 1.00 (musculoskeletal system) and 11.00 (neurological disorders). *Id.* The ALJ determined that McQuillan's physical impairments did not meet the requirements of the Listing of Impairments[6] because she was able to ambulate and use her extremities effectively. *Id.* The ALJ also determined that McQuillan's mental impairments did not meet or medically equal the criteria of

---

[6] 20 C.F.R. § Pt. 404, Subpt. P, App. 1.

listings 12.03 (schizophrenia spectrum and other psychotic disorders) or 12.04 (depressive, bipolar and related disorders). *Id.* In making this finding, the ALJ considered whether the "paragraph B" criteria were satisfied, and he determined that they were not, because the mental impairments did not result in at least two "marked" limitations or one "extreme" limitation as required by the listing. *Id.*

The ALJ then assessed McQuillan's residual functional capacity and found that she could "perform light work" with certain limitations. *Id.* at 22. The limitations were that McQuillan: could lift and carry 20 pounds occasionally and 10 pounds frequently; could sit for six hours and stand and/or walk for six hours in an eight-hour workday; could frequently stoop and could occasionally crawl, crouch, kneel, balance, and climb ramps and stairs with no climbing of ladders, ropes or scaffolds; could maintain occasional interaction with coworkers and supervisors, but could not interact with the general public. *Id.*

The ALJ determined that McQuillan's "medically determinable impairments could reasonably be expected to produce the . . . alleged symptoms; however, [McQuillan's] statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record . . . ." ALJ Decision, R. at 27. As a result, McQuillan's statements were "found to affect [her] ability to work only to the extent they [could] reasonably be accepted as consistent with the objective medical and other evidence." *Id.*

At the fourth step, the ALJ determined that McQuillan could not perform her past relevant work as a salesperson. *Id.* at 30. At the fifth step, the ALJ determined that, based on McQuillan's age, education, work experience, and residual functional capacity, "there [were] jobs that exist[ed] in significant numbers in the national economy that [McQuillan could]

perform." *Id.* Because the ALJ found that McQuillan was capable of making a successful

adjustment to other work, he concluded that "a finding of 'not disabled' [was] therefore

appropriate" and denied McQuillan's request for disability benefits. *Id.* at 31.

## II. Discussion

McQuillan challenges the ALJ's decision on three grounds: (1) the ALJ failed to give

proper weight to the opinions of Dr. Nissensohn and Counselor Greifendorf; (2) the ALJ

improperly accorded greater weight to the opinions of the state agency consultants; and (3) the

ALJ failed to properly evaluate McQuillan's residual functional capacity. I will address each

issue in turn.

### A. Issue One – ALJ's Weighting of Medical Evidence

McQuillan objects to the ALJ's weighting and consideration of the opinions provided by

her treating counselor, Marybeth Greifendorf, as well as the state agency consultant, Dr. Michael

Nissensohn. Because Greifendorf is a clinical therapist, the treating physician rule does not

apply to her opinion. *See* SSR 06-03P, 2006 WL 2329939, at *2 (Aug. 9, 2006) (categorizing

therapists as "other medical sources" distinct from "acceptable medical sources") (rescinded as

of Mar. 27, 2017)[7]. As a result, McQuillan's objections are considered in the context of whether

the ALJ's decision is supported by substantial evidence.

The substantial evidence standard, to reiterate from above, "means once an ALJ finds

facts, [the court] can reject those facts only if a reasonable factfinder would *have to conclude*

---

[7] For claims filed before March 27, 2017, the rules in 20 C.F.R. § 404.1527 apply. For claims filed on or after March 27, 2017, the rules in 20 C.F.R. § 404.1520c apply. Because McQuillan's claim was filed in 2015, the Court applies the regulations that were in effect at the time of filing. *See, e.g., Ogirri v. Berryhill*, 2018 WL 1115221, at *6 n.7 (S.D.N.Y. Feb. 28, 2018) (noting 2017 amendments to regulations but reviewing ALJ's decision under prior versions); *Rousey v. Comm'r of Social Sec.*, 2018 WL 377364, at *8 n.8 & *12 n.10 (S.D.N.Y. Jan. 11, 2018) (same).

*otherwise.*" *Brault*, 683 F.3d at 448 (quotation marks and citation omitted) (emphasis in original). The Second Circuit has "cautioned that ALJs should not rely heavily on the findings of consultative physicians after a single examination," and has advised that, ordinarily, "a consulting physician's opinions or reports should be given little weight." *Selian*, 708 F.3d at 419; *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990). In some circumstances, however, "the report of a consultative physician may constitute [substantial] evidence." *See Mongeur*, 722 F.2d at 1039; *see also Prince v. Astrue*, 490 F. App'x 399, 401 (2d Cir. 2013) ("consultative examinations were still rightly weighed as medical evidence"); *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) (summary order) ("the report of a consultative physician may constitute . . . substantial evidence.").

    1. *Michael Nissensohn, M.D.*

On February 24, 2016, Dr. Nissensohn opined that McQuillan's "morbid obesity [was] contributing to all of her current problems, except the psychiatric ones . . . [and] there clearly [was] evidence to make it difficult for her to perform any significant job function at this time." R. at 401. The ALJ afforded that opinion "little weight." ALJ Decision, R. at 29. McQuillan argues that the ALJ erred when he dismissed Dr. Nissensohn's opinion as vague and conclusory. Pl.'s Mem., p. 13. She principally takes issue with the ALJ's statement that Dr. Nissensohn's opinion was not a residual functional capacity assessment. ALJ Decision, R. at 29. The Commissioner responds that the ALJ did not discount the opinion simply because it was not a residual functional capacity assessment, but rather because it was "not consistent with the limited findings on the evaluation, as well as other records and [McQuillan's] activities." Def.'s Mem., p. 15. Because the ALJ's determination is supported by the evidence and because the ALJ's interpretation of the evidence on this issue was reasonable, I conclude that the ALJ did not err in

his decision to assign little weight to Dr. Nissensohn's opinion, which was not supported by an explanation of the medical evidence on which he relied.

McQuillan argues that the ALJ erred by substituting his own lay opinion for that of Dr. Nissensohn. Def.'s Mem., p. 14. She claims that by finding Dr. Nissensohn's conclusion inconsistent with the physical examination, the ALJ reinterpreted Dr. Nissensohn's notes. The Commissioner responds that Dr. Nissensohn's opinion was inconsistent with the opinions of the State agency physicians, and the record as a whole, which only documented "mild physical limitations" and a consistently normal gait. Def.'s Mem., p. 16. I agree with McQuillan that it is improper for an ALJ to substitute his opinion for those of examining experts. *See Selian,* 708 F.3d at 419 (ALJ's conclusion constituted an improper substitution of her own lay opinion in place of medical testimony). That, however, is not the case here.

In accordance with 20 C.F.R. § 404.1527(b), the ALJ is required to consider "the medical opinions in [the] case record together with the rest of the relevant evidence . . . receive[d]." In assigning little weight to Dr. Nissensohn's opinion, the ALJ reasonably concluded that it was inconsistent with the record as a whole. As an initial matter, Dr. Nissensohn examined McQuillan only once. "Generally, the longer a treating source has treated [a claimant] and the more times [a claimant] has been seen by a treating source, the more weight [the ALJ] will give to the source's medical opinion." 20 C.F.R. § 404.1527(c)(2)(i). When evaluating a medical opinion, the ALJ "will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories." 20 C.F.R. § 404.1527(c)(2)(ii).

Here, for example, Dr. Nissensohn's impression of "destructive osteoarthritis" is based on one examination during which he detected bony abnormalities upon palpation and a decreased

range of motion. R. at 399. Dr. Nissensohn also observed that McQuillan complained of pain, had "some difficulty walking," and favored "her right knee more than her left." R. at 399. By contrast, the ALJ references an August 24, 2016 visit to Dr. Thomas Bliss, an Orthopedic Surgeon, who documented a "reasonable range of motion in the knees." ALJ Decision, R. at 19. Generally, the ALJ will "give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(5). The ALJ also reviewed McQuillan's course of physical therapy for her knee pain. The record showed that McQuillan "responded well to conservative care including decreasing pain intensity and frequency." R. at 511. The ALJ noted that after seven visits, McQuillan withdrew from physical therapy. ALJ Decision, R. at 28. Evidence that physical therapy had improved McQuillan's condition supports the ALJ's finding that "her left lower extremity symptoms were intermittent." Additionally, McQuillan's withdrawal from physical therapy undercuts her subjective evaluation of pain. *See Arnone v. Bowen*, 882 F.2d 34, 39 (2d Cir. 1989) (failure to seek medical attention undercuts disability claim). All in all, I conclude that the ALJ did not substitute his judgment for that of Dr. Nissensohn. Rather, the ALJ considered Dr. Nissensohn's medical opinion, as well as the record as a whole, and gave good reasons for the weight he afforded the opinion.

McQuillan claims that the ALJ dismissed Dr. Nissensohn's opinion because it was not a residual functional capacity assessment. She cites the factors listed in 20 C.F.R. § 404.1527(a)(1) as evidence that the ALJ applied the incorrect legal standard to Dr. Nissensohn's opinion. Pl.'s Mem., p. 13. The regulation set forth at 20 C.F.R. § 404.1527(a)(1) requires that medical opinions "reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [he/she] can

still do despite impairment(s), and [his/her] physical or mental restrictions." In Dr. Nissensohn's opinion, however, there is no mention of what McQuillan "[could] still do" despite her impairments and restrictions, which coincidentally is the definition of residual functional capacity.[8] Furthermore, Dr. Nissensohn's impression of McQuillan's medical condition—namely, morbid obesity and osteoarthritis of both knees—does not mention any physical restrictions. R. at 400. The examination itself does not seem to support Dr. Nissensohn's broad assessment that McQuillan would find it difficult to perform "any significant job function." For example, the examination revealed that McQuillan had "pain on palpation of both knees," "some difficulty walking," and decreased range of motion, but a negative straight leg raising test, bilaterally. R. at 399. Despite some bony abnormalities consistent with chronic osteoarthritis, her "ankles, toes and hips were within normal limits." R. at 400. McQuillan's "upper extremities revealed good preservation of fine motor function of [her] fingers and [a] normal range of motion in the fingers, wrist, elbow and shoulder." R. at 400. During the exam, her affect was good, and she was alert and oriented. *Id.* Her blood pressure and GERD symptoms were well controlled with "no alarming symptoms to suggest anymore complicated diagnosis [than] simple reflux disease." *Id.*

The Commissioner argues that "Dr. Nissensohn's opinion seems to indicate that [McQuillan] would be limited in performing any job functions, despite finding no limitation in reaching, grasping, or fingering." Def.'s Mem., p. 16. I agree. "Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" *United States v. Gonzales*, 520 U.S. 1, 5 (1997). Here, the ALJ reasonably could have determined that the examination record simply did not support Dr. Nissensohn's restrictive assessment that

---

[8] "Residual functional capacity" is defined as "what the claimant can still do despite the limitations imposed by his [or her] impairment." 20 C.F.R. §§ 404.1520(a)(4), (e), 404.1545(a).

McQuillan would find it difficult to perform "any" significant job function. Having considered all the relevant factors, I conclude that the ALJ committed no legal error.

### 2. *Counselor Greifendorf*

McQuillan argues that the ALJ erred by not relying on Counselor Greifendorf's MSS. The MSS is a five-page form on which Greifendorf mostly checked various blocks detailing McQuillan's signs and symptoms, as well as a box indicating that McQuillan would likely be absent from work more than four days a month. R. at 538, 541. McQuillan argues that the ALJ should have afforded the limitations cited in the MSS greater weight. Pl.'s Mem., p. 17. Additionally, McQuillan argues that the ALJ wrongly concluded that her "mental status [had] remained mostly normal with only modest findings." ALJ Decision, R. at 29. The Commissioner argues that the ALJ is "entitled to weigh medical opinion evidence and to resolve conflicts in the evidence." Def.'s Mem., p. 20. The Commissioner references the portions of the MSS that discuss a decrease in auditory hallucinations, and the stabilization of McQuillan's mood, psychosis and self-esteem as evidence that the very restrictive opinions regarding "functioning and potential absences" were not only inconsistent with the report, but not supported by the record as a whole. R. 537. The questions, then, are whether substantial evidence supports the ALJ's factual finding and whether the ALJ applied the correct legal standard. *Pollard v. Halter*, 377 F.3d 183, 188 (2d Cir.2004) (internal quotation marks omitted).

### a. Legal Standard

Social Security Ruling 06-03p provides that nurse practitioners, physician's assistants, licensed clinical social workers, and therapists, among others, are considered "other sources." As such, their opinions "may be considered with respect to the severity of the claimant's

impairment and ability to work, but need not be assigned controlling weight."[9] *Genier v. Astrue*, 298 F. App'x 105, at * 4 (2d Cir. 2008); *see also* SSR 06-03p, 2006 WL 2329939, at **2-3 (S.S.A. Aug. 9, 2006). Although the ALJ is "certainly free to consider the opinions of these 'other sources' in making his overall assessment of a claimant's impairments and residual abilities, those opinions do not demand the same deference as those of a treating physician." *Genier*, 298 F. App'x at *4. An ALJ "has discretion to determine the appropriate weight to accord the [other source's] opinion based on all the evidence before him." *Diaz v. Shalala*, 59 F.3d 307, 314 (2d Cir. 1995). The ALJ in this case properly did not assign controlling weight to the opinion of the treating counselor, and he properly used his discretion to determine the appropriate weight to assign. McQuillan makes no persuasive argument to the contrary.

   b. MSS – Substantial Evidence

On August 24, 2016, and again on February 3, 2017, Greifendorf submitted MSS reports for McQuillan. R. at 542. Both reports are essentially the same, with the exception that the August date was crossed out and replaced with the February date. *Id*. Greifendorf's MSS reports take a restrictive view of McQuillan's ability to function in the workplace. Specifically, Greifendorf found that McMillan had "no useful ability to function" in many of the areas dealing with memory, work stress and maintaining concentration and attention. R. 539. In Greifendorf's opinion, McQuillan lacked the "mental abilities and aptitudes needed to do unskilled work." R. at 540. McQuillan argues that the ALJ erred in assessing the opinion of Greifendorf, her long-time counselor. McQuillan's argument, in effect, is that the ALJ should have weighed the

---

[9] Under SSR 06-03p (rescinded Mar. 27, 2017), a therapist was not an "acceptable medical source." However, therapists were listed as "other sources" used to establish the existence of an impairment. SSR 06-03p was rescinded by Federal Register Notice Vol. 82, No. 57, page 15263, which revised the medical source rules for claims filed on or before March 27, 2017. Under the revised rule, all medical sources, not just acceptable medical sources, can provide evidence that the SSA categorizes and considers medical opinion. McQuillan filed her claim before the revised rule went into effect.

evidence differently. But "the court's function is to first ascertain whether the Commissioner applied the correct legal principles in reaching his conclusion, and then whether the decision is supported by substantial evidence." *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). Although there was some evidence to the contrary, I conclude that substantial evidence supported the administrative law judge's decision to assign "little weight" to the MSS, and to find that: (1) McQuillan's "mental status [had] remained mostly normal with only modest findings;" (2) there had been no indication that McQuillan responded to internal stimuli or that she had required admission for nearly two years; and (3) she was able to function during the relevant time period at issue. ALJ Decision, R. at 29.

First, the ALJ's finding that McQuillan's mental status had remained mostly normal is supported by those sections of the report where Greifendorf documented a "significant decrease in auditory hallucinations" and "no mania since [January] 2016, as well as Greifendorf's observations that McQuillan appeared "to be improving with regard to mood stabilization, psychosis, and self-esteem." R. at 537. Next, the treatment records from McQuillan's visits to Nurse Rose from November 2015 to March 2016, generally reveal a pattern of improvement with medication management. R. at 402–37. On February 25, 2016, Nurse Rose documented that McQuillan "[had] gone 25 days without a psychotic symptom, particularly [audio hallucinations]." R. at 403. At the time of her last visit on March 23, 2016, Nurse Rose documented that McQuillan was "not having any psychotic symptoms at this time or since her last appointment," and "her mood [was] stable overall." R. at 437. In July 2017, McQuillan testified that her last hospitalization occurred in 2015. Tr. of ALJ Hr'g, R. at 48.

The Commissioner argues that "[a]n ALJ may consider a claimant's conservative treatment as additional evidence supporting the ALJ's determination." Def.'s Mem., p. 21. The

Second Circuit has cautioned that "the opinion of the treating physician [should not] be discounted merely because [she] has recommended a conservative treatment regimen." *Burgess v. Astrue,* 537 F.3d 117, 129 (2d Cir. 2008). The ALJ may, however, consider the fact that McQuillan did not require hospitalization "to support [a] conclusion that [she] is not disabled if that fact is accompanied by other substantial evidence in the record." *Id.* Here, a conservative outpatient treatment regimen seems inconsistent with the extreme limitation of "no useful ability to function." R. at 539−40. Altogether, the evidence supports the ALJ's finding that McQuillan's "mental status [had] remained mostly normal with only modest findings." ALJ Decision, R. at 29.

Next, McQuillan testified that episodes of audio hallucination occurred at random, and not on a daily basis. *Id.* She also testified that for a period of eight months, she did not experience any audio hallucinations. *Id.* at 52. With respect to the intensity and frequency of the hallucinations, McQuillan reported improvement with medication. *Id.* McQuillan also testified that she did not respond to the voices out loud because they occurred in "[her] thoughts." *Id.* at 56. Finally, there exists no evidence in the record to contradict the finding that "[n]o treating source observed [McQuillan] to be responding to internal stimuli." ALJ Decision, R. at 27. Hence, the ALJ's factual findings that "there [had] been no indication that McQuillan respond[ed] to internal stimuli or that she [had] required admission for nearly 2 years" must be given conclusive effect because they are supported by substantial evidence.

Finally, the ALJ's finding that McQuillan was active and able to function at home and in the community was supported with evidence from the record, including McQuillan's own testimony about her activities. In October 2015, McQuillan reported that she lived alone in an apartment. R. at 180. She prepared meals, took care of her pets, cleaned and shopped

approximately three times per week. R. at 180–83. In 2016, she attributed a significant weight loss to swimming and dieting. R.at 495. By late January 2017, McQuillan was socializing with men that she had met on an online dating site. R. at 543. In February 2017, McQuillan reported using the gym four times a week. R. at 597. In March 2017, hospital records show that McQuillan drove approximately fifteen hours, from Connecticut to Tennessee.[10] R. at 581. That same year, McQuillan flew to Texas to attend a wedding. Tr. of ALJ Hr'g, R. at 50. There is sufficient evidence in the record to support the weight assigned to Greifendorf's MSS report. Greifendorf opined that McQuillan's mental functioning was seriously limited, and the ALJ explained why he did not fully credit that opinion. ALJ Decision, R. at 29. Those reasons are persuasive; the ALJ relied upon notes that show McQuillan enjoying life and that demonstrate improvements in her condition. The ALJ was therefore entitled to give little weight to the MSS, because the opinion conflicted with the evidence in the record.

### 3. *State Agency Physicians*

The ALJ gave substantial weight to some of the State agency consultants "based on their particular and detailed knowledge of the standard of disability" and the consistency with the record as a whole. ALJ Decision, R. at 29. McQuillan takes issue with the greater weight assigned to some of the state agency consultant opinions compared with the opinion of Dr. Nissensohn, who was also a state agency consultant. The Commissioner argues that "the State agency physicians were afforded substantial weight, not only because of their expertise, but because [their opinions] were consistent with the record as a whole." Def.'s Mem., p. 11. "Administrative law judges and the Appeals Council are not bound by findings made by State agency or other program physicians and psychologists, but they may not ignore these opinions

_____

[10] On July 24, 2017, McQuillan testified that she could only drive short distances.

and must explain the weight given to the opinions in their decisions." SSR 96-6P, 1996 WL

374180 at *2 (S.S.A. July 2, 1996) ("In appropriate circumstances, opinions from State agency

medical and psychological consultants and other program physicians and psychologists may be

entitled to greater weight than the opinions of treating or examining sources.").

McQuillan also challenges the ALJ's reliance on the opinion of consulting sources who

did not have the opportunity to review Greifendorf's treatment notes after August 2016. Pl.'s

Mem., R. at 18. McQuillan's argument on this point is unavailing. Between August 2016 and

May 2017, McQuillan saw Greifendorf approximately six times. R. at 543−50; 624−25. That

evidence is cumulative of what is already in the record.[11] During that time period, Greifendorf's

treatment record mainly reaffirms that McQuillan experienced occasional audio hallucinations;

that she was able to ignore the "voices;" that she experienced sleep issues and anxiety; and that

she was socially active. *Id.*

As discussed above, McQuillan's treatment history, as well as her self-reported activities

were found to be inconsistent with Dr. Nissensohn's restrictive opinion and Greifendorf's MSS.

Because the ALJ did not rely solely on the state agency consultant's opinions, but instead

afforded those opinions greater weight after deeming them consistent with other evidence in the

record, he was within the bounds set by the Social Security regulations. McQuillan seeks

different evidentiary inferences but fails to show that any reasonable factfinder was compelled to

weigh the evidence differently than the ALJ did. It is the ALJ's role, and not mine, "'to resolve

evidentiary conflicts and to appraise the credibility of witnesses,' including with respect to the

---

[11] August 24, 2016 – No audio hallucinations. Anxiety due to inability to complete house chores. R. at 550;
September 7, 2016 – "[C]an hear voices when listens for them." Improved mood and stability. R. at 549. December
12, 2016 – Stressed . . . labile mood. Met someone on OK Cupid. R. at 545. January 25, 2017 – "Worrying about
SSN, court for bankruptcy, living situation." Reports continued AH. R. at 543. February 20, 2017 – "Continues
relationship with new boyfriend . . . Continues to report AH, but 'doesn't listen.'" R. at 624. May 2, 20217 –
"Voices have returned saying she's going to hell." R. at 625.

severity of a claimant's symptoms." *Cichocki v. Astrue*, 534 F. App'x 71, 75 (2d Cir. 2013)

(quoting *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983)); *see also*

*McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) ("If the evidence is susceptible to more

than one rational interpretation, the Commissioner's conclusion must be upheld.").

B.  Issue Two – ALJ Erred Assessing the RFC

McQuillan argues that the ALJ violated SSR 16-3p in evaluating her subjective

symptoms by "incorrectly exaggerat[ing]" her functioning.  Pl.'s Mem., p. 19.  The

Commissioner responds that McQuillan's statements "concerning the intensity, persistence and

limiting effects of her symptoms were not entirely consistent with the evidence of record."

Def.'s Mem., p. 22.  Under SSA regulations, "[w]hen determining a claimant's [residual

functional capacity], the ALJ is required to take the claimant's reports of pain and other

limitations into account." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).  The ALJ is not,

however, "required to accept the claimant's subjective complaints without question; he may

exercise discretion in weighing the credibility of the claimant's testimony in light of the other

evidence in the record." *Id.*  "Credibility findings of an ALJ are entitled to great deference and

. . . can be reversed only if they are patently unreasonable." *Pietrunti v. Dir., Off. of Workers'*

*Comp. Programs*, 119 F.3d 1035, 1042 (2d Cir. 1997) (internal quotation marks omitted); *see*

*Aponte v. Sec'y, Dep't of Health & Human Servs. of U.S.*, 728 F.2d 588, 591 (2d Cir. 1984) ("If

the Secretary's findings are supported by substantial evidence, the court must uphold the ALJ's

decision to discount a claimant's subjective complaints of pain.").  When a discrepancy exists

between the medical evidence and testimony, the ALJ is entitled to resolve that discrepancy. *See*

*Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (citing *Richardson v. Perales*, 402 U.S. 389,

399 (1971)).

The basis of McQuillan's objection is that the ALJ did not give specific reasons for "undermining her credibility." *See generally* SSR 16-3P, 2017 WL 5180304, at *10 (S.S.A. Oct. 25, 2017) (describing process used to evaluate a claimant's subjective symptoms). She offers a small portion of an otherwise thorough evaluation of McQuillan's activities of daily living and functioning as proof of the ALJ's error. McQuillan's argument is misplaced. The ALJ's decision chronicles McMillan's statements and testimony regarding her daily activities over a period of two years. ALJ Decision, R. at 27. In October 2015, for example, McQuillan indicated that she cared for her pets, prepared her own meals, drove a car, walked outside, shopped in stores, and performed household chores. R. at 180–87. McQuillan also reported that she could follow recipe directions "to the tee," and that she could "listen very closely." R. at 185. In March 2016, for instance, McQuillan was following a diet plan that had resulted in a weight loss of fifteen pounds. R. at 439. By September 2016, McQuillan had lost a total of thirty pounds, which she attributed to "swimming and dieting." R. at 495. The record reflects that from January 2014 to February 2017, McQuillan scheduled, and regularly attended, appointments at Thundermist Health Center. R. at 344–97; 403–51; 469–508; 592–623.

McQuillan's ability to keep appointments, exercise, follow directions and commit to a weight loss plan contradicts her testimony. At the hearing, McQuillan testified that, on average, she could not get out of bed at least three days a week and she could not "watch a half hour TV show" without getting distracted. Tr. of ALJ Hr'g, R. at 52, 55. McQuillan also testified that she spent most of her time at home, her only visitors were family members, and she only socialized with friends on the telephone. Tr. of ALJ Hr'g, R. at 52. The ALJ noted, however, a greater degree of social functioning was reflected in the record. For example, a review of the record shows that in April 2016 McQuillan was living with a boyfriend. R. at 433. At some time in

early 2017, McQuillan had begun meeting people using an online dating website.  R. at 543.

That same year, she attended a wedding in Texas.  R. at 50.  In February 2017, McQuillan

reported that she had a new boyfriend.  R. at 597.  She also reported exercising at a gym four

times a week.  *Id.*  In May 2017, she drove from Connecticut to Tennessee, a trip that took more

than fifteen hours to complete.  R. at 581.

McQuillan argues that the ALJ took the reported activities out of context, and that the

record should be interpreted differently.  Pl.'s Mem., p. 20.  She argues that the ALJ's

assessment of her daily living and social functioning did not take into consideration "the passage

of time and the degradation of her functioning."  *Id.* at 21.  That argument is unavailing.  As

stated above, the ALJ's assessment reflects a period of two years, from at least 2015 through

2017.  Furthermore, the ALJ made clear that McQuillan's "ability to engage in numerous daily

and/or social activities . . . is not outcome determinative on the issue of disability, but is only one

of several factors that [he] considered.  Ultimately, it [was] the entire record as a whole that [led]

the [ALJ] to conclude that [McQuillan was] not disabled."  ALJ Decision, R. at 28.

It is not in the province of the District Court reviewing the decision of the ALJ to

undertake anew the weighing of conflicting evidence.  Rather, I must look to whether the correct

legal standard was applied and whether the record contains substantial evidence to support the

ALJ's decision—irrespective of whether there are other decisions the ALJ might have made, or

even whether I might have made another one myself.  The record has evidence of improvement

and control of McQuillan's symptoms.  It might be that McQuillan would weigh that evidence

differently than the ALJ did, regarding it as too slight or potentially temporary to be weighed

more heavily, but even if I agreed, I would not be able on that basis to conclude that the ALJ's

decision relied on an incorrect legal standard or was not supported by substantial evidence.

I do not consider the ALJ's credibility findings to have been "patently unreasonable" or unsupported by "substantial evidence," and therefore conclude that the ALJ did not err in his credibility finding here. *See Pietrunti*, 119 F.3d at 1042; *Aponte*, 728 F.2d at 591.

## III. Conclusion

For the reasons set forth above, McQuillan's Motion to Reverse (Doc. No. 15) is DENIED, and the Commissioner's Motion for an Order Affirming the Decision of the Commissioner (Doc. No. 16) is GRANTED. The Clerk shall enter judgment and close the case.

So ordered. Dated at Bridgeport, Connecticut, this 1st day of April 2020.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge